J-S02007-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                                : PENNSYLVANIA
                                                :
                                                :
                v.                              :
                                                :
                                                :
                                                :
QUADIR JEFFRIES                                 :
                                                :
                Appellant                       : No. 1719 EDA 2022

Appeal from the PCRA Order Entered July 24, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005829-2014

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                                : PENNSYLVANIA
                                                :
                                                :
                v.                              :
                                                :
                                                :
                                                :
QUADIR JEFFRIES                                 :
                                                :
                Appellant                       : No. 2496 EDA 2022

Appeal from the PCRA Order Entered July 24, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005830-2014

BEFORE:   LAZARUS, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, P.J.:                    **FILED MAY 3, 2024**

Quadir Jeffries appeals from the order, entered in the Court of Common

Pleas of Philadelphia County, dismissing his petition filed pursuant to the Post

Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-46.  After careful review,

we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

This Court previously adopted the trial court's factual summary of these cases as follows:

In early January[ ]2014, [R.M.,] was working as a pizza delivery driver[,] was driving his vehicle when he noticed a woman, later identified as Kimberly Cook, walking down the street near 54th Street and Lansdown[e] Avenue in Philadelphia. R.M. honked his horn at Cook and pulled over his vehicle to talk with her, hoping to exchange phone numbers and meet with her later. At this time, Cook identified herself as "Zah." While [R.M.] and Cook were talking and exchanging phone numbers, Cook noticed that [R.M.] had an amount of U.S. currency on the passenger side floor of his vehicle.

After meeting [R.M.], Cook told her boyfriend, co-defendant Hakim Blatch, about the meeting and ask[ed] Blatch to rob [R.M.] Blatch agreed and arranged to have co-defendants [Jeffries] and Alonzo Wallace aid in the robbery. The plan was for Cook to accompany [R.M.] to his house, while Blatch, Wallace, and [Jeffries] followed in a separate car. Cook would then open the door for Blatch, Wallace, and [Jeffries] to enter and rob [R.M.]

On January 18, 2014, Cook called [R.M.] under the false pretense of meeting [R.M.] to have sex. Cook arranged for [R.M.] to pick her up near 56th Street and Lansdown[e] Avenue later that evening. Cook, Blatch, Wallace, and [Jeffries] then headed to 56th Street and Lansdown[e] Avenue in [Jeffries'] car. Also with them was Cook's friend, Crystal Collins. Cook wished to have Collins present with her, as Cook did not know [R.M.] and was nervous about meeting him alone. Blatch, [Jeffries], and Wallace waited in [Jeffries'] car around the corner from where [R.M.] was waiting[,] while Cook and Collins exited the vehicle and met with [R.M.]

[R.M.] arrived at the corner of 56th Street and Lansdown[e] Ave[nue] and waited for approximately 45 minutes before Cook arrived, accompanied by Collins. [R.M.] had both women get into his car and drove to his apartment on the 4200 block of North 7th Street in Philadelphia. While [R.M.] was driving, Cook was texting Blatch, providing directions as to where [R.M.] was driving and the address at which they stopped.

Upon arriving at [R.M.]'s apartment, [R.M.], Cook, and Collins went inside and had a conversation about sex. While they were talking, Blatch, [Jeffries], and Wallace arrived at [R.M.'s] apartment, finding the outside door locked, and Blatch texted Cook to tell her to open the door. At this time, Cook asked if she could go outside to smoke a cigarette, and [R.M.] gave her the keys to his car, telling her that he had a lighter inside of it. Cook then went downstairs and opened the door for [Jeffries] and Wallace to enter the building and directed them to [R.M.]'s bedroom. [Jeffries] and Wallace entered the building and went upstairs while Cook went to the street corner, throwing away [R.M.'s] keys, where she was later joined by Collins. As Collins left the building, Blatch entered.

After letting Cook out of the apartment and watching her go down the steps, [R.M.] closed his door, only to reopen it and see men rushing up the steps. [R.M.] attempted to close his door, but [Jeffries] and Wallace kicked the door in, forcing [R.M.] to the ground. While [R.M.] was on the ground, [Jeffries] and Wallace pistol whipped him with handguns while demanding that [R.M.] tell them where the money was[] and threatening to shoot him. Blatch joined [Jeffries] and Wallace while they were beating [R.M.] The assailants rummaged through [R.M.'s] room looking for cash[] and found a cookie tin with marijuana and cash. They failed to find th[e] large sum of cash that was in [R.M.'s] pocket.

[M.S.], who lived in the apartment across from [R.M.], heard the commotion and opened his door to see what was happening. [M.S.] saw two men standing in [R.M.'s] broken doorway. Wallace, noticing [M.S.] open the door, turned towards [M.S.] and shot at him. Closing the door as Wallace turned, [M.S.] ducked and was shot through the door, with the bullet striking his left arm. Had [M.S.] not ducked, the bullet would have struck [M.S.'s] heart. As the three robbers left the apartment building, [Jeffries] fired a shot at a security camera inside the front door.

Hearing the assailants leave, [R.M.] checked on [M.S.] while [M.S.] called the police. Police responded and were let into the house by [R.M.] [M.S.] and [R.M.] were transported to Temple University Hospital for medical treatment.

Police recovered one [nine-millimeter] fired cartridge case and one [40 caliber] fired cartridge case from the first-floor hallway of the home. Police also recovered the video tapes of the home

surveillance system that covered the front entryway into the building.  The inside camera appeared to be damaged by a gunshot.  After his release from the hospital, [M.S.] found the [40 caliber] bullet that had struck him in his room and gave that bullet to the landlord, who turned it over to police.

Later [on the night of the shooting], Blatch, Cook, Collins, Wallace, and [Jeffries] all met at a speakeasy on Jackson and Taney Streets.  While the group was together, they discussed Wallace shooting [M.S.] and [Jeffries] shooting out the camera.  At this time, Blatch stated that Wallace and [Jeffries] had already pistol-whipped [R.M.] by the time Blatch got upstairs.  [Jeffries] gave Collins some money at the speakeasy while Blatch gave Cook some marijuana.

Police provided the media with a copy of the surveillance video, in an effort to get public help in identifying the robbers.  Deputy Sheriff Martin Samuels, who knew both Blatch and [Jeffries] from his time patrolling the area, watched the video of the assault and identified Blatch and [Jeffries] as two of the perpetrators.  Police also conducted an analysis of the phone [R.M.] had used to contact Cook, and from that, were able to identify Cook as a suspect in the case.  Police put Cook's photo in a photo array and showed it to [R.M.], who identified Cook as the person he stopped on the street and who set him up for the robbery.

[Jeffries] was arrested on February 23, 2014.  Police made several efforts to locate Blatch and Cook in February and March 2014, but were unable to locate them.  Blatch and Cook were arrested on June 4, 2014.  Wallace was arrested on June 11, 2014.  After her arrest, Cook provided a statement to police, detailing her involvement in the robbery.  Cook also identified Blatch, Wallace, and [Jeffries] to police.  A cell tower analysis of the location of Blatch's cell phone on the night of the robbery corroborated Cook's statement to the police regarding the events surrounding the robbery.

***Commonwealth v. Jeffries***, 169 A.3d 1157 (Pa. Super. 2017) (Table).

The Commonwealth charged Jeffries at Docket Number CP-51-CR-0005829-2014 (No. 5829) with crimes against M.S., including attempted

murder,[1] aggravated assault,[2] criminal conspiracy,[3] and firearms not to be carried without a license.[4] At Docket Number CP-51-CR-0005830-2014 (No. 5830), the Commonwealth charged Jeffries with crimes committed against R.M., including aggravated assault,[5] robbery,[6] and burglary.[7]

On December 10, 2015, following a consolidated jury trial, Jeffries was convicted of the above-mentioned offenses and found not guilty of attempted murder. The trial court deferred sentencing and ordered the preparation of a pre-sentence investigation report. On February 17, 2016, the trial court conducted a sentencing hearing and sentenced Jeffries to an aggregate sentence of 20 to 40 years in prison. Jeffries filed a timely notice of appeal, and, on April 12, 2017, this Court affirmed Jeffries' judgments of sentence. *See Jeffries*, *supra*.

On March 13, 2018, Jeffries filed a *pro se* PCRA petition, his first, at both docket numbers. Subsequently, Jeffries retained Teri Himebaugh, Esquire, who entered her appearance on Jeffries' behalf. On September 11, 2019,

_____

[1] 18 Pa.C.S.A. § 901(a).

[2] *Id.* at § 2702(a)(1).

[3] *Id.* at § 903.

[4] *Id.* at § 6106(a)(1).

[5] *Id.* at § 2702(a)(1).

[6] *Id.* at § 3701(a)(1)(ii).

[7] *Id.* at § 3502(a)(1).

Attorney Himebaugh filed an amended PCRA petition. On March 5, 2020, the PCRA court issued notice pursuant to Pa.R.Crim.P. 907 of its intent to dismiss Jeffries' petition without a hearing. On April 9, 2020, Jeffries filed a *pro se* response to the Rule 907 notice. On April 20, 2020, Attorney Himebaugh filed a motion to withdraw. On July 24, 2020, the PCRA court granted Attorney Himebaugh's motion to withdraw, and dismissed Jeffries' PCRA petition.

On July 30, 2020, the PCRA court appointed James F. Berardinelli, Esquire, to represent Jeffries on appeal. On August 17, 2020, Attorney Berardinelli filed a notice of appeal to this Court. On October 30, 2020, Jeffries filed a *pro se* application for relief with this Court, in which he requested to proceed *pro se* on appeal. Subsequently, on November 23, 2020, Attorney Berardinelli filed a motion to withdraw in this Court. On that same day, this Court remanded the matter to the PCRA court to conduct a ***Grazier***[8] hearing. On December 15, 2020, this Court granted Attorney Berardinelli's motion to withdraw.

On December 28, 2020, the PCRA court conducted a ***Grazier*** hearing and determined that Jeffries' waiver of counsel was knowing, intelligent, and voluntary. This Court then issued a briefing schedule on January 5, 2021. However, Jeffries failed to file a brief, and this Court dismissed Jeffries' appeals on March 23, 2021.

---

[8] ***Commonwealth v. Grazier***, 713 A.2d 81 (Pa. 1998).

On March 29, 2021, Dennis Turner, Esquire, entered his appearance on Jeffries' behalf. On November 29, 2021, Attorney Turner filed, at both dockets, a PCRA petition, Jeffries' second, alleging that Jeffries was in administrative custody at SCI Forest when this Court issued its January 5, 2021 briefing schedule. Jeffries argued that, as a result of being in administrative custody, he was unable to access the prison library and, thus, was unable to comply with this Court's briefing schedule. On March 17, 2022, the Commonwealth filed a response and agreed that an evidentiary hearing was necessary.

On June 3, 2022, the PCRA court conducted an evidentiary hearing. At this hearing, evidence was presented that this Court's briefing schedule was sent to the wrong prison address. *See* PCRA Court Opinion, 8/22/22, at 2-3. At the conclusion of the PCRA hearing, the PCRA court granted Jeffries' second PCRA petition and reinstated his right to appeal *nunc pro tunc*, at both dockets, from the PCRA court's July 24, 2020 order dismissing his first PCRA petition.

On July 3, 2022, Attorney Turner filed a notice of appeal, *nunc pro tunc*, at No. 5829, in which he purported to appeal from the June 3, 2022 order reinstating Jeffries' direct appeal rights. Subsequently, on August 1, 2022, Attorney Turner filed a motion to withdraw.

On August 15, 2022, Zak T. Goldstein, Esquire, entered his appearance on Jeffries' behalf. Attorney Goldstein filed, in this Court, an application to remand the appeal at No. 5829, in which he requested permission to fix

Attorney Turner's error in the *nunc pro tunc* notice of appeal, and to file an amended notice of appeal correctly stating that Jeffries was appealing from the July 24, 2020 order dismissing his first PCRA petition. This Court granted Attorney Goldstein's request and remanded for a corrected notice of appeal.

On remand, Attorney Goldstein filed a PCRA petition at No. 5830, in the PCRA court, in which he requested that he be allowed to file another *nunc pro tunc* notice of appeal from the July 24, 2020 order dismissing the first PCRA petition at No. 5830. Attorney Goldstein argued that Attorney Turner had erroneously failed to appeal at No. 5830, and that Attorney Turner's failure amounted to *per se* ineffective assistance of counsel. The PCRA court granted Attorney Goldstein's PCRA petition and reinstated Jeffries' appellate rights at No. 5830, *nunc pro tunc*. Subsequently, Attorney Goldstein filed a corrected *nunc pro tunc* notice of appeal at No. 5829, and a *nunc pro tunc* notice of appeal at No. 5830. On November 9, 2022, this Court *sua sponte* consolidated Jeffries' appeals. **See** Pa.R.A.P. 513.

Both Jeffries and the PCRA court have complied with Pa.R.A.P. 1925.[9] Jeffries now raises the following claims for our review:

---

[9] On November 20, 2020, the PCRA court prepared its first Rule 1925(a) opinion when it originally dismissed Jeffries' first petition, a second Rule 1925(a) opinion on August 22, 2022 in response to Jeffries' second petition, and a third Rule 1925(a) opinion on January 30, 2023, addressing Jeffries' claims from the prior PCRA petitions for the instant *nunc pro tunc* appeals. In its January 30, 2023 Rule 1925(a) opinion, the PCRA court incorporated its prior 1925(a) opinions. **See** PCRA Court Opinion, 1/30/23, at 1-24; PCRA Court Opinion, 8/22/22, at 1-3; PCRA Court Opinion, 11/20/20, at 1-12.

1. Whether PCRA counsel and trial counsel failed to properly challenge the warrantless search of [Jeffries'] cell phone where the police seized the phone, called the phone['s] number, and then looked at the phone's screen before obtaining a search warrant?

2. Whether [Jeffries] received [] ineffective assistance of counsel when trial counsel failed to object as the prosecutor argued in closing that he had thoroughly investigated the case and could personally vouch for the most important witness's credibility?

3. Whether trial counsel should have objected when the trial court failed to instruct the jury that it was required to reach a unanimous decision with respect to the object of the alleged conspiracy?

4. Whether trial counsel erred in failing to call defense witnesses who would have impeached the credibility of one of the Commonwealth's critical identification witnesses?

5. Whether the Commonwealth committed a *Brady* violation requiring a new trial where the Commonwealth failed to disclose that the witness had been promised a time served sentence and[,] instead[,] argued that she could receive a sentence of up to 100 years?

Brief for Appellant, at 8.

When reviewing the [dismissal] of a PCRA petition, our scope of review is limited by the parameters of the [PCRA]. Our standard of review permits us to consider only whether the PCRA court's determination is supported by the evidence of record and whether it is free from legal error. Moreover, in general[,] we may affirm the decision of the [PCRA] court if there is any basis on the record to support the [PCRA] court's action; this is so even if we rely on a different basis in our decision to affirm.

*Commonwealth v. Heilman*, 867 A.2d 542, 544 (Pa. Super. 2005) (quotations and citations omitted).

Where a petitioner challenges the PCRA court's decision to deny a request for an evidentiary hearing, "[a] reviewing court on appeal must

- 9 -

examine each of the issues raised . . . in light of the record to determine whether the PCRA court erred in concluding that there were no genuine issues of material fact and denying relief without an evidentiary hearing." ***Commonwealth v. duPont***, 860 A.2d 525, 530 (Pa. Super. 2004). "[T]here is no absolute right to an evidentiary hearing on a PCRA petition, and if the PCRA court can determine from the record that no genuine issues of material fact exist, then a hearing is not necessary." ***Commonwealth v. Springer***, 961 A.2d 1262, 1264 (Pa. Super. 2008) (quotation marks and citation omitted).

In his first four claims, Jeffries challenges the effectiveness of his counsel. Generally, counsel is presumed to be effective and "the burden of demonstrating ineffectiveness rests on [the] appellant." ***Commonwealth v. Rivera***, 10 A.3d 1276, 1279 (Pa. Super. 2010).

> To satisfy this burden, an appellant must plead and prove by a preponderance of the evidence that[:] (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness there is a reasonable probability that the outcome of the challenged proceeding would have been different. Failure to satisfy any prong of the test will result in rejection of the appellant's ineffective assistance of counsel claim.

***Commonwealth v. Holt***, 175 A.3d 1014, 1018 (Pa. Super. 2017) (internal citations omitted).

In his first claim, Jeffries argues that prior PCRA counsel rendered ineffective assistance of counsel for failing to challenge trial counsel's ineffectiveness where trial counsel failed to file a motion to suppress Jeffries'

- 10 -

phone, found during a search of his home, based upon the purported testimony of his minor brother, R.H.B.[10] **See** Brief for Appellant, at 18-26. Jeffries contends that R.H.B. was home when police executed an unrelated search warrant on Jeffries' home.[11] **See id.** at 21-26. Jeffries asserts that R.H.B. was playing with Jeffries' phone when police ordered R.H.B. to give them the phone, and that the police did not have a warrant for Jeffries' phone. **See id.** at 24-25. Jeffries posits that his prior counsel rendered ineffective assistance for failing to pursue a motion to suppress the contents of the phone. **See id.** In support of his contention, Jeffries argues that there is arguable merit to a motion to suppress his phone because it was obtained without a warrant, and that police conducted a "search" of his phone when they called the phone number and looked at the screen of his phone. **See id.** (citing **Commonwealth v. Fulton**, 179 A.3d 475, 487 (Pa. 2018) ("any search of a cell phone requires a warrant")). Jeffries further contends that prior PCRA counsel lacked a reasonable basis for failing to raise this claim because the United States Supreme Court had already decided **Riley v. California** and

_____

[10] In his first claim, Jeffries presents a layered claim of ineffective assistance of counsel, which he raises for the first time on appeal. **See Commonwealth v. Bradley**, 261 A.3d 381, 405 (Pa. 2021) (allowing PCRA petitioner to raise claims of ineffective PCRA counsel at the first opportunity to do so, even if on appeal).

[11] It is undisputed that police were executing a search warrant on Jeffries' home for an unrelated investigation.

- 11 -

*United States v. Wurie*, 574 U.S. 373 (2014).[12]  *See* Brief for Appellant, at 24-25.  Jeffries argues that he, therefore, suffered prejudice and is entitled to a new trial or, in the alternative, a PCRA evidentiary hearing for the PCRA court to assess R.H.B.'s credibility.  *See id.* at 25-26.  We disagree.

Where ineffective assistance of counsel on appeal is asserted, to prove prejudice, the appellant must show that there is a reasonable probability that the outcome of the appeal would have been different but for counsel's deficient performance.  *See Commonwealth v. Staton*, 120 A.3d 277, 295 (Pa. 2015).  Our Supreme Court has held that remand for an evidentiary hearing is unnecessary where an appellant fails to satisfy all three prongs of the ineffective assistance of counsel test.  *See Commonwealth v. Spotz*, 870 A.2d 822, 833 (Pa. 2005).

Jeffries' first claim is predicated on trial counsel's failure to find, investigate, and call Jeffries' brother, R.H.B., as a witness.  It is well settled that a PCRA petitioner cannot prevail on a claim of trial counsel's ineffectiveness for failure to call a witness unless the petitioner shows that:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew or, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

---

[12] In *Riley*/*Wurie* the United States Supreme Court held that warrantless seizures of cell phones may be permissible as a result of a search incident to arrest, but the subsequent search of a cell phone is unconstitutional without a warrant.  *See id.* at 386-87.

*Commonwealth v. Washington*, 927 A.2d 586, 599 (Pa. 2007). To satisfy the prejudice prong of this analysis, a PCRA petitioner "must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." *Commonwealth v. Gibson*, 951 A.2d 1110, 1134 (Pa. 2008) (citations omitted).

We further observe that we must remand for an evidentiary hearing "in cases where the PCRA court declined to hold a hearing, and where an assessment of witness testimony was essential to a petitioner's ineffectiveness claims[.]" *Commonwealth v. Johnson*, 966 A.2d 523, 540 (Pa. 2009). This is so that the PCRA court can observe the witness and make credibility determinations based upon the live testimony of the witness. *See id.* at 539 (noting "one of the primary reasons PCRA hearings are held in the first place is so that credibility determinations can be made; otherwise, issues of material fact could be decided on pleadings and affidavits alone").

Instantly, the verified statement, appended to Jeffries' response to the Commonwealth's motion to dismiss, states as follows:

> My name is [R.H.B.] I am [] Jeffries['] younger brother. I remember the day that the police came into my house. My brother was already in police custody. I was 8 years old and had just come home from school. I got home before my mom did[,] so I was alone.
>
> I heard banging on the door so I [] peek[ed] through the pee[p] hole, then [went] upstairs to my room and called my mom[.] Then[,] right after that[,] I heard banging, voices[,] and moving something[] downstairs. I was really scared.

[] I called my mom using [m]y brother's cell phone. When the police came into my house they came up the stairs and found me in my room. I was crying and talking on the phone to my mom. The police officer was yelling at me to tell him who was on the phone. I think my mom could hear what the police were yelling at me. I was ordered to hang up the phone by police[,] so I did.

They took me out of the bedroom[ and] downstairs to the living room. One of the police used his phone to dial my brother's phone number. The phone I had been on [] rang once. The[ police] asked for the pass[]code. They were police so I did what they said[,] but I accidentally gave them the wrong passcode. I was very frightened and I mixed up the pass[]code. I saw the officer playing with the phone trying the numbers I had given him. That's when I gave police [the correct passcode to Jeffries'] phone[.]

[Jeffries' trial attorney] never spoke to me before [his] trial. Even though I was young[,] I would have been willing to testify if I was asked to. I am still willing and available to testify at any hearing that may be held in this case.

Revised Verified Affidavit of R.H.B., 2/4/20, at 1-2.

In its opinion, the PCRA court concluded that Jeffries had failed to establish the prejudice prong. *See* PCRA Court Opinion, 1/30/23, at 14-16; PCRA Court Opinion, 11/20/20, at 9-11. In particular, the PCRA court concluded that even if trial counsel had successfully challenged and suppressed Jeffries' phone, it would not have changed the outcome at trial. *See* PCRA Court Opinion, 1/30/23, at 12-16. After review of the record, we agree.

At trial,[13] the Commonwealth presented R.M.'s testimony of the incident, and he identified Cook as the woman he saw on the street when he was delivering pizzas. *See* N.T. Jury Trial (Day 1), 12/3/15, at 201-02. R.M. testified that he "hollered" at Cook because he "liked the way her back was." *Id.* at 202-03. R.M. and Cook exchanged contact information and agreed to meet up for sex. *Id.* at 202-06 (R.M. testifying Cook texted him four days later to "hook up"). Cook and R.M. met and, as the evening progressed, Cook asked if she could go outside to smoke. *See id.* at 206-20 (R.M. detailing evening's events). R.M. testified that shortly after Cook exited the apartment, several men ran up the stairs and into his apartment. *See id.* at 220. The men began to assault R.M. and demanded money. *See id.* at 220-23. R.M. then identified Jeffries, in court, as one of the men who attacked him. *See id.* at 222-23.

Further, the Commonwealth presented the testimony of Cook, who acknowledged that she engaged in a conspiracy with Jeffries and Blatch to rob R.M. *See* N.T. Jury Trial (Day 3), 12/7/15, at 57-136 (Cook testifying on direct examination about nature of conspiracy and agreement between Cook, Jeffries, Blatch, and Wallace to rob R.M.).

Based upon the foregoing, we agree with the PCRA court that the above evidence was so overwhelming that Jeffries cannot establish prejudice for his

---

[13] We provide only a shortened version of the facts here, as we accepted the PCRA court's detailed summary above.

claim that trial counsel should have suppressed his phone records. *See Holt*, *supra*. Assuming *arguendo* that R.H.B.'s purported testimony would be found credible, the foregoing evidence presented at Jeffries' trial was so overwhelming that suppression of the phone records would not have changed the outcome of the trial. Therefore, the PCRA court did not err in dismissing Jeffries' PCRA petition without an evidentiary hearing, and, accordingly, we grant Jeffries no relief on this claim.

In his second claim, Jeffries raises a layered ineffectiveness claim that his prior PCRA counsel rendered ineffective assistance in failing to preserve his claim that his trial counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's closing argument. *See* Brief for Appellant, at 26-31. Jeffries argues that the prosecutor vouched for Cook's credibility and honesty by continuously stating that he had personally verified the information Cook provided to the Commonwealth. *See id.* at 28. Jeffries asserts that the prosecutor's statements constituted impermissible witness bolstering. *See id.* at 28-31. Jeffries contends that a prosecutor is "generally considered a trustworthy figure by jurors" and that trial counsel rendered ineffective assistance by allowing the prosecutor to lend his trustworthiness to Cook's testimony. *Id.* at 30. We disagree.

> Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one. Not every inappropriate remark by a prosecutor constitutes reversible error. A prosecutor's statements to a jury do not occur in a vacuum, and

we must view them in context. Even if a prosecutor's arguments are improper, they generally will not form the basis for a new trial unless the comments unavoidably prejudiced the jury and prevented a true verdict.

*Commonwealth v. Bedford*, 50 A.3d 707, 715-16 (Pa. Super. 2012) (internal citations and quotation marks omitted). Additionally, "[a] prosecutor is free to present his argument with logical force and vigor so long as there is a reasonable basis in the record[.]" *Commonwealth v. Reid*, 99 A.3d 470, 507 (Pa. 2014).

Further, "[i]n determining whether the prosecutor engaged in misconduct, we must keep in mind that comments made by a prosecutor must be examined within the context of defense counsel's conduct. It is well settled that the prosecutor may fairly respond to points made in the defense['s] closing." *Commonwealth v. Judy*, 978 A.2d 1015, 1019-20 (Pa. Super. 2009) (quotations and citations omitted).

"Vouching" is a "form of prosecutorial misconduct occurring when a prosecutor 'places the government's prestige behind a witness through personal assurances as to the witness's truthfulness, and when it suggests that information not before the jury supports the witness's testimony.'" *Commonwealth v. Ramos*, 231 A.3d 955, 959 (Pa. Super. 2020) (citations omitted). "Improper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record." *Commonwealth v. Chmiel*, 30 A.3d 1111, 1180 (Pa. 2011) (citation omitted).

- 17 -

Instantly, the PCRA court addressed this claim as follows:

> [Jeffries] claims that PCRA counsel was ineffective for failing to raise an ineffective assistance of trial counsel claim for failure to challenge prosecutorial misconduct that occurred during the prosecutor's closing argument. In particular, [Jeffries] claims that the prosecutor improperly vouched for the credibility of . . . Cook. [Jeffries] specifically complains that the prosecutor stated, among other things, that the Commonwealth had "fact-checked" Cook's testimony and that it was "100 percent accurate." N.T. [Jury Trial (Day 5)], 12/9/[]15, at 117. In addition, [Jeffries] notes that the prosecutor stated he had scrutinized Cook's testimony, that his job was to present truthful evidence, and that he would not have put her on the stand if he had found out that she was lying.
>
> * * *
>
> Here, defense counsel, in his closing argument, made an *ad hominin* attack on the prosecutor, accusing [the prosecutor] of intentionally distorting the evidence to make it appear that [Jeffries] was guilty. In particular, in the course of arguing that [] Cook was not credible, defense counsel noted that . . . "not one district attorney" followed up with an investigation of Cook's ex-boyfriend, who was alleged to be an international drug dealer. [**See id.** at 68.] Accordingly, instead of properly arguing the weaknesses in the Commonwealth's evidence, defense counsel chose to personally attack the prosecutor and accuse him of intentionally omitting evidence that contradicted his theory of the case in order to paint an unfair and inaccurate picture of the facts.

PCRA Court Opinion, 1/30/23, at 19-20.

Based upon our review of the record, we agree with the PCRA court's determinations. In the defense's closing, counsel additionally implied that the prosecution engaged in "deception . . . fabrication . . . [and] sneakiness" in its investigation and presentation of the prosecution's case. **See** N.T. Jury Trial (Day 5), 12/9/15, at 73. Defense counsel further accused the prosecutor of failing to disclose "things that went down with [Cook] and the deal and the

omissions." *Id.* at 74. While the prosecutor's comments may have amounted to impermissible vouching for Cook's credibility, we are constrained to consider those comments in the context of defense counsel's closing arguments. *See Judy*, *supra*. Therefore, we conclude that the comments by the prosecutor were a fair reply to defense counsel's argument and, consequently, Jeffries' prior counsel were not ineffective for failing to preserve and raise this claim. Accordingly, Jeffries is entitled to no relief on this claim.

In his third claim, Jeffries argues that his prior PCRA counsel were ineffective in failing to preserve a claim that trial counsel rendered ineffective assistance of counsel by failing to object to the trial court's instruction on conspiracy. *See* Brief for Appellant, at 31-37. Jeffries contends that the trial court was required to instruct the jurors that they must "unanimously agree that the defendants conspired to commit at least one specific crime." *Id.* at 31. Jeffries asserts that the trial court failed to properly instruct the jury and, consequently, Jeffries posits his trial counsel rendered ineffective assistance by failing to object to the deficient instruction. *Id.* at 31, 34-37. We disagree.

The PCRA court addressed this claim as follows:

During its final charge on the law, the [c]ourt instructed the jury on the charge of conspiracy as follows:

The defendants are each charged with conspiracy to commit burglary, robbery, and/or aggravated assault. So[,] even though there's only one conspiracy charge listed on the form, there's three alleged goals of the conspiracy. It would be sufficient for you to find one, two, or all three, any of those would be sufficient if you find proven beyond a reasonable doubt the charge of criminal conspiracy.

- 19 -

Now, in Pennsylvania[,] joining in a conspiracy or creating a conspiracy is itself a crime even if the crime or crimes the people planned is not carried out. The members of the conspiracy are still responsible for the distinct crime of the conspiracy.

In general terms, a conspiracy is an agreement between two or more persons to commit a crime, and a conspiracy exists once two conditions are met: [f]irst, there is an agreement, and then one of the members commits some act to help achieve the goal of the conspiracy.

Now I am going to explain each element in greater detail.

The first element of a conspiracy is an agreement. It could be stated in word or unspoken but acknowledged, and it must be an agreement in the sense that two or more people have come to an understanding that they agree to act together to commit a crime or crimes. Their agreement does not have to cover the details of how the crime or crimes will be committed, nor does it have to call for all of them to have participated in actually committing the crime or crimes. They can agree that one of them will do the job, but what is necessary is that the parties do agree, that is to say, that they come to a firm, common understanding that a crime will be committed.

Now[,] although the agreement itself is the essence of the conspiracy, a defendant cannot be convicted of conspiracy unless he or a fellow conspirator does something more, what we call an overt act[,] in furtherance of the conspiracy.

The overt act is an act by any member of the conspiracy that would serve to further the goal of the conspiracy. It could be criminal or noncriminal in itself as long as it's designed to put the conspiratorial agreement into effect to show that [the] parties have a firm agreement and are not just thinking or talking about committing a crime. The overt act shows that the conspiracy has reached the action stage. If the conspirator actually commits or even attempts to commit the agreed-upon crime, that would be an overt act in furtherance of the conspiracy. But a small act or step

that is much more preliminary and a lot less significant can satisfy the overt act requirement.

The Commonwealth may prove a conspiracy by direct evidence or by circumstantial evidence. People who conspire often do their conspiring secretly and try to cover up afterward, and in many conspiracy trials, circumstantial evidence is the best or even the only evidence on the questions of whether there was an agreement, that is to say, a common understanding, and whether the conspirators shared the intent to promote or facilitate committing the object crime.

Therefore, you may, if you think it proper, infer that there was a conspiracy from the relationship, the conduct, and the acts of the defendant and his alleged coconspirators and the circumstances surrounding their activities; however, the evidence of this must support your conclusion beyond a reasonable doubt.

And a defendant cannot be convicted merely because he was present with others or even because he knew what the other or others planned or were doing. There must be proof of an agreement between the defendant and another person or persons to form or continue a conspiracy, and to be proved guilty of being a conspirator, the defendant must have intended to act jointly with the other coconspirators and must have intended that the crime or crimes alleged to be the goal of the conspiracy would be committed.

N.T. [Jury Trial (Day 5),] 12/9/15, at 165-69.

While [Jeffries] argues that the instruction was unlawful, apart from the first paragraph, it tracks exactly the language of Pennsylvania's Suggested Standard Criminal Jury Instruction for conspiracy. *See* Pa. SSJI(Crim), § 12.903A. This instruction accurately states the law. Moreover . . . [t]he [c]ourt concluded its instructions by notifying the jurors that their verdict must be unanimous. [*See* N.T. Jury Trial (Day 5), 12/9/15, at] 186. This sufficiently imparted to the jury the need to unanimously agree on an objective.

[Jeffries] contends that trial counsel should have requested that the [c]ourt use the alternative instruction set forth at section

- 21 -

12.903B, which explicitly states, "Before any defendant can be convicted, the 12 jurors must agree on the same person whom the defendant allegedly conspired with, the same object crime, and the same overt act." Pa. SSJI(Crim), § 12.903B. However, the Subcommittee Note to that instruction states that this alternative is only necessary "where the evidence is complex, a potential variance exists between the charge and the proof, and there is some real possibility of juror confusion[.]" Subcommittee Note to Pa. SSJI(Crim), § 12.903B.

Here, the evidence was not complex and there was no possibility of juror confusion. The defendants agreed to break into the victim's home, assault him, and rob him. All three objects (burglary, robbery, and aggravated assault) were integral to the agreed[-]upon crime. Moreover, the jury convicted [Jeffries] of all three object offenses. Therefore, there was no potential for a conviction to result from different jurors finding that the object crimes were different.

Accordingly, trial counsel was not ineffective for failing to challenge the [c]ourt's jury instruction on the charge of conspiracy. As a result, PCRA counsel could not have been ineffective for failure to raise a meritless claim. No relief is due.

PCRA Court Opinion, 1/30/23, at 21-23.

After our review of the record, we agree and adopt the PCRA court's determinations and conclusions regarding Jeffries' third claim. *See* Pa. SSJI(Crim), § 12.903A; *id.* at § 12.903B; *see also id.* Subcommittee Note. Accordingly, we afford Jeffries no relief on this claim. *See Commonwealth v. Antidormi*, 84 A.3d 738, 754 (Pa. Super. 2014) (Pennsylvania courts afforded broad discretion in phrasing jury instructions, and "[o]nly where there is an abuse of discretion or an inaccurate statement of law is there reversible error.") (citation omitted).

In his fourth claim, Jeffries argues that trial counsel rendered ineffective assistance of counsel by failing to call two witnesses who would have

impeached Samuels. *See* Brief for Appellant, at 37-47. We address these witnesses together, as their proposed testimony is similar and both proposed testimonies are related to Jeffries' overarching claim that his trial counsel rendered ineffective assistance for failing to impeach or rebut Deputy Sheriff Samuels' identification of Jeffries.

Jeffries asserts that Samuels was biased against Jeffries because Ms. Blatch, Jeffries' mother,[14] repeatedly turned down Samuels' advances. *See id.* at 41-43. Jeffries contends that Samuels testified that he was familiar with Jeffries due to encountering Jeffries at Ms. Blatch's water ice truck from 2008-2011; however, prior to trial, Samuels had been unable to identify Jeffries in the video and had only identified Blatch as one of the perpetrators. *See id.* at 42-44. Jeffries posits that Samuels' identification of him was therefore a misidentification, either intentional or mistaken, and that trial counsel should have called Ms. Blatch to rebut Samuels' testimony. *See id.* at 44.

Jeffries further argues that trial counsel rendered ineffective assistance of counsel by failing to call Ms. Blatch, who would have testified that Jeffries was under house arrest, or incarcerated, during the times that Samuels allegedly purchased water ice from Ms. Blatch. *See id.* at 44-45. Jeffries alleges that trial counsel was aware of Ms. Blatch's testimony, because trial counsel had originally intended to call Ms. Blatch to rebut Samuels' testimony,

---

[14] Relevantly, it is undisputed that Ms. Blatch operated a water ice truck at Wilson Park from 2008 through 2013. *See id.* at 41-44. Ms. Blatch often had family members assisting her. *See id.*

but that trial counsel inexplicably failed to call Ms. Blatch to the stand. *See id.* at 44-46.

Similarly, Jeffries argues that trial counsel rendered ineffective assistance of counsel for failing to call Charlene McGuffie to refute Samuels' testimony. *See* Brief for Appellant, at 46-48. Jeffries asserts that McGuffie would have testified as follows:

> I am 56 years young. I reside[d] in Wilson Park for 21 years. I've been [on] Wilson Park[']s Resident Council for 5 years, also worked for Philadelphia Housing Authority for 10 years. I've lived across the street for many years as [Jeffries] grew up. . . . [Ms. Blatch] purchased a water ice truck and I never saw [Jeffries] work with her on that truck. [Jeffries] had a little brother [R.H.B.] who work[ed] with [Ms. Blatch] and [R.H.B.'s] friends. I know this because I've always watched everything that went [on] on Bail[e]y Terrace for years. . . . I've bought candy [and] water ice for my grandchildren many, many times over the years and always [R.H.B. was] serving me[, not Jeffries.] I lived on the block [between] 1998 [and] 2018.

*Id.* at 46-47. Jeffries posits that trial counsel had no reasonable basis for failing to call McGuffie based upon the above proffered testimony. *See id.* at 47. Jeffries argues that, in light of McGuffie's and Ms. Blatch's proposed testimony, it is clear that Samuels' identification of Jeffries was mistaken or intentional. *See id.* Jeffries contends that his trial counsel's failure to call McGuffie and Ms. Blatch constituted ineffective assistance of counsel because it permitted the jury to rely on the unchallenged identification testimony of Samuels, a member of law enforcement. *See id.* at 47-48. We disagree.

The PCRA court addressed these claims as follows:

At trial, the Commonwealth called [] Samuels to explain how the police initially came to identify [Jeffries] as one of the assailants in this case. Before becoming a deputy sheriff, Samuels had been a Philadelphia Housing Authority [officer] for 20 years, and had spent six of those years patrolling the Wilson Park Projects. During that time, he came to know [Jeffries] and [] Blatch. Samuels testified that he came to know [Jeffries] through his interactions with him during his community policing[.] Samuels also testified that he knew [Ms. Blatch], who sold water ice in front of her house, and that he would see [Jeffries] around his mother when he bought water ice from her.

During the investigation of the shooting and robbery at issue, the Philadelphia police released the surveillance video to the public to see if anyone knew the assailants depicted in the video. Samuels viewed the video on YouTube and recognized both [Jeffries] and Blatch. As a result, he contacted the Philadelphia police and positively identified both [Jeffries] and Blatch as the robbers. Samuels testified there was absolutely no doubt in his mind that the two men in the video were [] Blatch and [Jeffries].

\* \* \*

The record refutes [Jeffries'] claim that trial counsel was ineffective for failing to call [Ms. Blatch and McGuffie]. First, the impeachment value of these witnesses was *de* minim[*i*]*s*. As for Samuels'[] alleged bias, defense counsel elicited from Samuels on cross-examination that he had a romantic interest in [Ms.] Blatch, and that he had asked her out, but she had never responded. Accordingly, counsel already had a basis to argue that Samuels was biased against [Jeffries] because [his mother] had spurned [Samuels'] attempts to start a relationship.

The proffered testimony of [Ms.] Blatch and McGuffie that [Jeffries] did not work at the water ice stand had even less impeachment value, since Samuels never testified that he saw [Jeffries] working at the stand. Rather, Samuels only testified that he had seen [Jeffries] "around" [Ms.] Blatch when she was selling water ice. Accordingly, there was no reason for defense counsel to believe that calling these two witnesses would meaningfully help his case.

Moreover, apart from the testimony of Samuels, there was overwhelming evidence establishing the identity of [Jeffries] as

- 25 -

one of the assailants.  [] Cook, who set up the robbery, testified that [Jeffries] accompanied Blatch and Wallace to [R.M.'s] apartment in order to rob [R.M.] and that [Jeffries] had shot out the camera as they left.  The video surveillance footage recovered from the home clearly depicted defendant as he entered the home and again as he left the home following the attack.  [Jeffries'] face was not obstructed and the jury had a clear view of [him] in the surveillance footage.  This surveillance video, alone, clearly established [Jeffries'] identity.

Finally, [R.M.] identified [Jeffries] in court as the first person coming up the stairs.  Given the strength of this evidence, even if the proffered witnesses could have substantially impeached the credibility of Samuels, that would not [] give rise to a reasonable probability that the outcome of this trial would have been different.

Accordingly, the record establishes that it was reasonable for trial counsel not to call these two witnesses, and that in any event, his failure to call them could not have prejudiced [Jeffries].  For that reason, the PCRA [c]ourt properly rejected the claims regarding those witnesses without a hearing.

PCRA Court Opinion, 1/30/23, 10-12 (citations omitted).

We conclude that the record supports the PCRA court's conclusions and determinations.  As we noted *supra*, a PCRA petitioner "must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." *Gibson*, *supra*.  As discussed by the PCRA court, Ms. Blatch's and McGuffie's proffered testimony would have had minimal impact on the outcome of the case. *See* PCRA Court Opinion, 1/30/23, at 10-12.  Indeed, Jeffries was readily identifiable from the surveillance video of the robbery, which the jury had the opportunity to view. *See id.* at 11-12.  Consequently, Samuels' alleged bias against Jeffries due to Ms. Blatch refusing

Samuels' advances, several years prior, is of no moment. *See Gibson*, *supra*. Accordingly, Jeffries is entitled to no relief on this claim.

In his fifth claim, Jeffries argues that the PCRA court erred in denying his PCRA petition where the Commonwealth failed to disclose its plea agreement with Cook, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Brief for Appellant, at 48-54. Jeffries asserts that the Commonwealth represented to the jury, and to Jeffries, that, in exchange for Cook's testimony, Cook received a reduction in charges, but that there had been no agreement for a more lenient sentence. *See id.* at 48-50. Jeffries contends that on October 12, 2015, Cook sent a handwritten letter to her boyfriend, in which Cook purportedly represented that she had agreed to a "time served" sentence in exchange for her testimony. *See id.* at 52-54. Jeffries posits that the Commonwealth lied to the jury, and to Jeffries, about the nature of Cook's plea agreement, because of the October 12, 2015 letter, and Cook received a sentence of 11½ to 23 months' incarceration and was immediately eligible for parole. *See id.* We disagree.

Our Supreme Court has explained

> in order to establish a *Brady* violation, a defendant must show that: (1) the evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence was favorable to the defendant either because it was exculpatory or because it could have been used for impeachment; and (3) the evidence was material in that its omission resulted in prejudice to the defendant. However, the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense. Rather, evidence is material only if there is a reasonable

- 27 -

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Williams*, 168 A.3d 97, 109 (Pa. 2017) (citations, quotation marks, and brackets omitted). Further, "[t]o obtain a new trial based on the Commonwealth's failure to disclose evidence affecting a witness's credibility, the defendant must demonstrate that the reliability of the witness may be determinative of the defendant's guilt or innocence."

*Commonwealth v. Tharp*, 101 A.3d 736, 747 (Pa. 2014).

The PCRA court addressed this claim as follows:

[Jeffries'] claim is premised upon a letter Cook [allegedly] wrote to co-defendant [] Blatch two months prior to the trial, in which Cook allegedly wrote, "I pleaded guilty and they dropped some of my charges they also want me to testify against yall [sic] if yall [sic] don't take a deal[.] I don't want to do that but they said if I do I will get time served[.]" Defense Exhibit P8 to Amended First [PCRA] Petition. [Jeffries] argues that this letter proves that the Commonwealth made a promise to Cook, which was never disclosed to the defense, of a time-served sentence in exchange for her testimony at trial.

[Jeffries'] claim was properly rejected by the [PCRA c]ourt. In support of the claim, PCRA counsel submitted a hearing certification signed by counsel averring "i[]t is believed and averred" that [] Cook would testify at a hearing that she wrote the letter to [] Blatch in which she stated she would get a time-served sentence in exchange for testifying. Amended First [PCRA] Petition[, at] 43. Counsel acknowledged that she was **unable to authenticate the letter or even locate and interview Cook**. Amended First [PCRA] Petition[, at] 34 n.7. Moreover, [Jeffries] never averred that Cook claimed that she was actually promised anything by the prosecutors in exchange for her testimony; only that she wrote to [] Blatch, against whom she had agreed to testify, making such a claim. Of course, Cook, who was in a relationship with [] Blatch at the time the letter was allegedly

- 28 -

written, had a strong motive to lie to [] Blatch in an effort to justify to him her decision to testify against him. In any event, absent any proffered evidence of an actual promise made by the Commonwealth to Cook, [Jeffries] was not entitled to a hearing on this claim.

PCRA Court Opinion, 1/30/23, at 17-18 (emphasis added, some citations omitted).

After review of the record, we agree with the PCRA court's determinations and conclusions regarding this claim. Further, we observe that, at trial, Cook testified as follows:

Prosecutor: Do you understand what "open plea" means?

Cook: Yes.

Prosecutor: What's an open plea?

Cook: That I could get anywhere from 50 to 100 years.

Prosecutor: That's the maximum you could receive?

Cook: Yes.

Prosecutor: An open plea as opposed to a negotiated plea means there's no numbers that are discussed between you and your attorney as well as you, myself, and my boss, right?

Cook: Yes.

* * *

Prosecutor: And that I will be obligated under this agreement to tell the judge whether or not you testified truthfully in any and all matters that you are called to testify on?

Cook: Yes.

Prosecutor: And if you don't testify truthfully, what is your understanding there?

Cook: The deal is over.

Prosecutor: And you say "deal." What does that mean? The word "deal," what does that mean?

Cook: The agreement.

Prosecutor: In other words, I can make a recommendation to—

Cook: Yes.

Prosecutor: [--your sentencing judge] and ask for up to the max, right?

Cook: Yes.

Prosecutor: But as far as your sentencing, if you testify truthfully, [your sentence is entirely up to the judge?]

Cook: Yes.

Prosecutor: Did you understand that when you signed this on October 1—

Cook: Yes.

N.T. Jury Trial (Day 3), 12/7/15, 125-28. From this exchange, we conclude that Cook had a clear understanding that her plea deal was not for "time served." *See id.* Rather, Cook would receive no recommendation on sentence from the prosecution in exchange for her testimony in the instant case. *See id.* Thus, as the PCRA court noted in its opinion, it is likely that Cook attempted to convey this "time served deal" in order to preserve her relationship with Jeffries' co-defendant Blatch. *See* PCRA Court Opinion, 1/30/23, at 17-18; *see also id.* at n.7 ("In the letter purportedly written by Cook, she repeatedly expresses her love for [] Blatch."). In light of the

foregoing, we conclude that the PCRA court did not err in denying Jeffries a hearing on this claim.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/3/2024